Good afternoon, Illinois Appellate Court, 1st District. Court is now in session. The 1st Division, the Honorable Justice Michael B. Hyman presiding. Case number 2-0-0-5-5-6. Fortune Investments vs. Cadley Properties. Thank you. All right. Mr. Silk, let's see. Why don't you say your name and see if we can just see how it sounds. John Silk on behalf of Appellants. A million times better. Thank you very much. Appreciate it. When, before we went for the five minute break. Mr. Hi, Mr. Dave. Casey. Casey, Casey. Asked our clerk, whether he could put in our notes. And I said I would wait till you came back and I might answer his question because the clerks asked me to answer the question. And the answer is we prefer to have you both on screen at all times. So, and the reason for that is we're on screen at all times. They were here and it's in the courtroom you'd be there. So and we're treating this like the quarter. So there's a basis for it. It's not just that we're trying to make more difficult. So, Mr. So we're going to restart your clock. But you can, you know, where we heard the first part but whatever you want to do, it's fine with us however you wish to proceed, you're starting on your first point. So if you want to begin again on your first point to bring us back where we were, that would be great. Your Honor before we can everyone hear me fine. Yeah, I don't hear any. You hear Mr. So, I can hear Mr DC. Thank you very much. So Your Honor. When we left off, you were asking the question about whether this was a sale or refinance. And you brought up the question of who the borrower was, and the reason this was refinance aside from the fact of what the documents show. And what the documents show is, you know, there's no sale price listed. There's no purchase, purchase or a seller identify each unit. There's no closing statement for these units like you would find for a sale of a unit. These were the last 17 units out of 70 that were so that out of 70 total 53 had previously been sold. They all had a routine of how they were sold there were closing statements for each one. I understand. I understand it. I mean, I know the facts. Well, having read everything in the record. But my question is refinancing has a specific definition. Would you agree. Yes. Oh, what is it in your brief I do not see any reference to tell me what it means to have refinancing, we talked about refinancing but you don't define the term. What is a refinance in your opinion. So, refinances. When a borrower, who is the owner of certain properties, and has a loan uses to go to an alternate source of financing, and a new lender comes in and takes on the same collateral under certain terms. And that's exactly what happened here, the lender in this case, the new lender was an outfit called handsome. No, but the real estate is not in the hands of fortune. A real estate is in a third party's hands. And the real estate was still have to be in fortunes hands to be a refinance. Well, what, what happened was, I know, I know what happened. But that doesn't mean that it isn't a sale what I what I'm getting at is, what is a sale versus what is a refinance to me that really gets down to the issue. Talk about all these factors, but unless we know what we're talking about. You have to define your term. And you're saying, I, what happened here fits into the definition of refinance. And what I'm saying is under the definition you just gave us. It doesn't fit in, because the properties and units are no longer in the hands of fortune. And unless they're in fortunes hands. Then, if they're not in fortunes hands, then case over. It's been taken over by another party. Well, Your Honor. I do understand what you're saying but I think the distinction here is, is that the entity you're referring to is a NAA holdings. And the reason that fortune did not sell these units to a NAA. That's pretty clear we don't have a purchase and sale agreement we don't have a closing statement. Mr. Mr. So, when this transaction began, who had title of the units title to the units was in fortune investments, and when this transaction was over, who had title of the units, a NAA holdings. Well, that doesn't have as Justice Hyman just said that doesn't happen in a refinance you use you change title in this transaction, or the parties did correct in that. And the reason for that, and again, I know you had reasons but how does that transform something into a refinance. Well, it, you know, I don't think it needs to transform into a refinance, you know, as the documents all show was a refinance what happened was the borrower and the refinance. In order for the refinance to occur. The new lender required that the borrowers interest be assigned, not sold, but be assigned to a related entity. And the reason they had to do that was because the fortune entity was involved in a dispute with Cato and the new lender couldn't have couldn't have a new loan with an entity that was already in a dispute. So, and the reason. The reason that this happened. The reason this refinance happened was nothing to do with fortune investments. What happened was Cato properties, the lender here had to repay a loan. We know the facts. But again, it seems, you're, you know, the facts of the fact, but it doesn't work with the definition of a refinance, because fortune. As the property. How a sale is a much broader concept and the refinance, you agree to that. Well, Judge, I don't know that I would agree to that I guess I guess my question would be, if it doesn't fit within the definitions of a refinance, does it fit within the definitions of a sale. And that's really the real question because under the settlement agreement, it has to be a sale. Right. And, and so how can you have a sale. If you don't have a seller. If you don't have a purchaser. If you don't have a buyer. The entity is called the buyer on some of the document title and some other, but in the documents, there may not have been an entity called seller, but doesn't matter there was a buyer. Well, Judge. The, the disbursement statement you're referring to as a two page statement, and I'd encourage you to look at it because in one place. It refers to a buyer, and quite frankly, I believe it refers to fortune. Perhaps I don't recall who it refers to as the buyer, but in several other places. It refers to the same entity as borrower. And it refers to a loan policy statement not an owner policy statement I mean, up and down, whatever they call that entity that entity is not fortunate isn't there is no. There is no. The entity is not a subsidiary affiliate of fortunate. The entity is a related entity to fortune, and it's related because of his wife. Correct it was it was it was it was an entity that at the time. I'm not sure who was in control of it at the time, but within the same family so it's simply, again, for the sole purpose of allowing the new lender to make this loan to an entity that was not in a dispute with Cato. And again, this was all done at the direction of Cato work for the benefit of kale. So are you saying that your opinion would be different if the other entity wasn't a relative of the owner of fortune. No, Your Honor, that was just in response to. I mean, irrelevant it's it's a, it's another entity that is the buyer. I completely agree. To me, the only relevant question here is under the settlement agreement for them to pursue the defendant there had all the units had to have been sold. And we know how 53 of the units were sold. We know what that process was. And the documentation and the testimony overwhelmingly shows that these last 17. We're not certainly weren't done in that respect as the previous 53, and there's no indication whatsoever that any of these units, but this was a sale. There just isn't other than it was, they were given. It was $70,000 for each of the units was associated with that. Correct. Um, then why would they say $70,000 per unit, because they took 1.2 million which was the amount of the refinance and just divided it by 17 and came out with 70,000 there was no sale price for that amount. And when you sell things in bulk. You wouldn't do it individually if there's a there's a reduction. When you sell things in bulk and so here. The 17 units were being given to sold to the other entity for $1.2 million that's, I mean that that's the position as I understand it of the other side. That is the position of the other side your honor but again, there is absolutely no indication that there's that there was a sale here of any type there's a lot of indications of refinance and it seems as to your point as to the name of the If you're, you're no longer in possession of the property. That is a sale I don't you know you can. Again, sales a much broader term, and, and you're, you're, you're arguing that this should be considered a refining without defining that term in your papers. So, but my understanding of the general concept of refinancing is that the entity who borrows the money. It's got to be the same entity that had the money at the end it has the property the same property, you know, the property goes to a third party. That's not a refinance. Well then, if it's not a refinance, how does it explain the new lender coming in. You know it just, I'm sorry it just doesn't fit with the facts of what happened. The lender can come in with the, the, the, the entity that the other entity initials. Why sensitive. They borrowed 1.2 billion correct. Correct. And. And that 1.2 million ended up in fortune, and unfortunate in Cato's possession correct. Correct. It was at the request of gave up for that 1.2 million is that those properties went to the wife's company. Cato released its lean on the, on the 17 units. That's right. So we have a whole different ballgame. Don't we. I guess Your Honor, I don't. I don't see how the fact that it had to be all the testimony was it had to be assigned from fortune to Anna, in order for the refinance to occur. And I don't think the fact that that assignment had to occur in order to make this transaction happen which again was at the behest of Cato. I don't think that changes the nature of the transaction. Especially in light of doing it then just out of the goodness of their hearts. You know judge, it's a good question. And the reason fortune did it was because, you know, they were in a relationship with Cato as their lender, and, you know, they're trying to work things out Cato. Again, the testimony is very clear Cato came to fortune and said, we're in default on our loan, because you haven't been able to pay us. We haven't been able to pay Colton, which is our lender. And so we need you to do this we need you to refinance to, we need 1.2 million in order to pay off our lender Colton. And in order for that to happen we need 1.2 million from you. And fortune doesn't have 1.2 million. So, what fortune says is the only thing we can do is refinance have another lender come in with 1.2 million and pay, essentially that 1.2 million from Pensum went to Cato to pay Cato's lender Colton. And there was a refinance we're now pensum is the lender for those 17 units. The one wrinkle to this refinance was Pensum would not do the refinance with fortune. So they had to just assign it to a different entity. So, you know, so that's, that's what happened. And, you know, why fortune did it. Yeah, to be on good terms with its lender to try and, you know, keep this, keep this relationship going and satisfy its lender any way it could. And now it's now it's gotten burned by that, because not only are they claiming that this is a sale. They're also claiming like we only have to give you $70,000 credit for each of these 17 units. Meanwhile, they were selling for 250,000 by Cato's own testimony. So not only does this fortune get burned in the respect that they're not claiming it's a sale. They get burned because they're not able to have the unit sold for 250,000 over 17 units that's a $3 million difference without loans could have been paid down $3 million more. Nobody, you're not, you're not accusing anyone of fraud. Not saying anybody try to pull anything on over and anybody both sides. And we're involved with your eyes open. This was a negotiated agreement. Right. It absolutely doesn't remain in force that agreement remains over and you're not saying otherwise. It absolutely was negotiated agreement in what fraud. And then, you know, went into this with your that you went into this with their eyes open. And, and Cato did too. And if Cato had wanted to negotiate something that said listen, we know we're refinancing the 17 units. We know the settlement agreement says they all have to be sold. Let's figure that out now Cato could have done that. But the burden of you, if you were worried about it, you could have, you know, you, I mean it goes both ways. It does but fortune had no reason to be worried about it because they clearly viewed it as a refinance. It's not a sale. I don't think it's so clear, you say clearly, you know, if it was so clear, I don't think your gentleman would be before us today right. It isn't. And to say it's clear doesn't help us at all. Because, as I started, I think that an issue in this very much an issue, whether it's a refinance or a sale right that goes to the heart. It's not clear at all. Clearly your honor there's a disagreement here I fully know that is clear. That everybody it was clear what was going on is not clear if you understand what I'm saying. That may be the only thing that's clear. Right. Right. You want to go into your other points. Sure. And these will be free for your honor. The second, the second reason that judgment was entered on counts one and two, on behalf of plaintiff. The second reason it was improper by the trial court is that, as we've been talking about here, we have two agreements. We have the note that the plaintiff sued on. And we have a sub, we have a settlement agreement. And what's not disputed is that at trial, the only evidence plaintiff put forth as to its liability and was based on the settlement agreement. And the problem with that is that they sued under the note, and the note in the settlement agreement have different terms and different material terms. For instance, the amount that was old is different under the note than it is under the settlement agreement. And the interest rate is different. And that's significant in this case because you're talking about a $17 million judgment were roughly I think 13 million of it is interest. So, so these are significant terms, and at trial plaintiff, and this isn't disputed I don't believe put forth no evidence as to their damages under the note, but instead relied completely on the settlement agreement. And I believe plaintiff argues that well the settlement agreement incorporated the note. In fact the settlement agreement says the opposite. It says that the note the loan documents shall remain in full force in effect. If there's a contradiction between the two documents the settlement agreement is going to control. But there was a contradiction was there not. I don't think there's a, there's a contradiction. With regard to damage. Well, if there's, if there's a contradiction, and they choose to proceed under the settlement agreement they should have sued under the settlement. It said, it said, if there's a disagreement. If there's a contradiction between the two the settlement agreement prevails, and that what they did. No, they, I mean, that doesn't your honor that doesn't mean the fact that one isn't that isn't what happened here, according to the settlement agreement, and the damage. Well, when you say what, when you say what happened here. They, they, they proceeded under the settlement agreement. Okay. So, yes, my question to answer my question. Yeah. Damages were under the settlement, which is what you just said, what's going to happen. But, but, but judge. Why did they sue under the note, they can, because they do although no. They're not doing that. They're doing under the note you owe the money, and can do and wasn't being paid. Right, but my point is, they sued under the note. But at trial the only offer, they, they computed their damages and under the settlement agreement. So, these are the agreement provided. But these, these are two separate documents. Why didn't they. You just told me that the settlement agreement incorporated didn't know. No. No, I said it did not. I'm sorry. The settlement agreement says if there's a difference between the note and the settlement agreement the settlement agreement is that is where you look. Correct. But that doesn't mean just because one document says that there's a conflict between two documents. The one document controls doesn't mean that that second documents incorporating the first talk. You know, I have no problem if they want to proceed under the settlement agreement, they could have done that. But they, you know, they have played, they could have followed the lawsuit under the settlement agreement it wasn't like the settlement agreement. All right. I mean, I don't think the law you. What's your best case saying that they can't do that under the law. You know, I cited series of cases in the brief. And. Okay. Pages 13 of the appellant brief. There's several cases cited basically in this back pattern. When there's a settlement agreement and an original contract and none of them allow for what paid I'll did here, which was Sue under the note, and then at trial attempt to obtain a judgment under the settlement agreement and judge loft is raised this issue at the trial court. And she essentially said and I think we quoted her brief. She said to be sure plaintiff could have sued on the settlement agreement directly defendants are correct in asserting that by suing under the note and mortgage plaintiff is bound by the terms of those documents, including the maturity date. So, Judge loft is certainly recognized when presented with these facts that you can't, you can't sue under one contract, and then proceed under a completely separate contract. You're bound by excuse me. Who but who basket. One more time judge. It wasn't really the trial judge. Yes, thank you. Right. No judge loft is dealt with count three which was eventually settled, he was the chance. We're dealing with it with what basic did. So, judge I'll move on to the, there are no more questions I got the third point. And that's the trial courts calculation of the damages here. And, you know, it's. It was so far off. It really makes it difficult to understand where the trial court was coming. So, the trial court awarded damages of 12.2 million in outstanding principal on the note, and 4.8 million in interest. And that's what the plaintiff for his closing argument. So the trial court just took wrote down apparently wrote down what the plaintiff requested and the closing argument gave them the exact to the penny dollar amount. Now what the trial evidence was, was that. And this is from Mr Cato himself, the plaintiffs representative. But the judge. Mr Cato may have been mistaken and the judge can look at all the evidence that was for him to make a decision based upon all the evidence and doesn't have to rely on simply because of what Mr. There. No judge but there's not, you cannot find one piece of evidence, nor has to provide the court with any. Now, one piece of evidence that suggests there's 12.2 million outstanding principal or anything near that number. The only evidence was that the interest amount was 11.7 in interest in 5 million in principle. And this. The other testimony was that fortune paid 13.3 million. Okay, that's Cato's own testimony there's no dispute there. They have a $17 million loan. They acknowledge that 13.3 million was paid. And the judge awarded 12.2 million in principle. And another 4.7 and I mean, it makes no sense, I'm sorry just makes no sense and has no relationship with the evidence presented and plaintiff in their brief has not presented any evidence to the contrary. And the last point, point number four was that defendants and files and counterclaims and again the settlement agreements language was clear that the plaintiff was supposed to pay for some property expenses. They did not over a period of time. The defendants, out of their own pocket pages expensive. A couple of exhibits were admitted to trial that outline these. And again, there was no testimony, the testimony on both sides was the same Mr Benitez on behalf of Cato admitted that certain expenses were paid by fortune. But in spite of that the trial court denied or found in favor of the defendants counterclaims, and that's our last point. Thank, thank you. And you have five minutes for rebuttal. Thank you. Proceed. Go ahead. Oh, I'm sorry. May it please the court. My name is Douglas DCG is he and I represent the plaintiff counter defendant and Appley cable properties of Illinois, Inc. Your Honors on February 25 2020 after holding a two day trial, Judge kabashi entered a four page. Let's get down to the issue that we don't need to all know the facts. Okay. One question is $70,000 for 17 fair. That doesn't seem right what why would these things are going for 240 or 50,000 on up. And they only get a credit. Like 70,000 times 17 which was the amount of alone I don't get it. Well, first off, they were not going for 250,000 at that time there was a glut in the market and Mr McBean could not sell these properties. He was in default under the note in the settlement agreement, he did just start making some payments to my client. So eventually it was agreed that there would be the need for 1.2 million. This was a firehouse sale that he had to make because he had no choice. Well he sold them to an insider. He could have sold them to see could have tried to do a players LA open market, but he didn't, he sold them to his wife's company. And instead is counsel called a refinance which I don't necessarily agree with. They just found a single lender to give them enough to satisfy this amount. They wanted to maximize, you didn't get the lender. No, that was that was Mr McBean, if Mr McBean was interested in selling these units at the market rate, he could have done more marketing, he could have done more selling, he could have done more advertising. knew what was going on with regard to the price per year. I'm sorry, pardon me. He knew what was going on with the price per unit when he entered into the settlement. Yes, I believe so. He understood how it would be applied because it's how it had been applied the entire time. The bottom line on this case is Mr McBean borrowed money and didn't repay it. His biggest argument in this case was that he didn't sign a personal guarantee. And after putting on witnesses to show that it was his signature. It's not that he said he didn't sign it he said, I don't remember signing. Yeah. But I mean, that goes to the credibility of the witnesses which is what the judge reviewed. All right, but, but the issue is whether this was a sale. I would agree with you. I would agree with your honor that if it stayed in the name of fortune. It would be a refinance not a sale, but it didn't it transferred to a new entity, my client lost security interest when it went to that new entity. My question is, how does this happen. Why is this so unclear, usually you can tell if something is a sale or refinance, what was going on here. I was not involved at the time and I wish I was, I would have paid a little bit more attention to make sure things were documented better but that's not what happened. We had Mr. Mr McBean, a businessman, dealing with Mr Cable of business. And so this is more of an informal type of transaction between the parties. I wouldn't call it informal, I think it was very formal you know there was a lot of community because there was certainly a lot of money changing hands. Most of the money changed hands in the beginning. And again, my client was paying back or reimbursing any expenses that were paid by Mr McBean, they were giving credit for everything he paid. You know this is this is a problem in when, if we all look back at when the market turn. This is about when this all happened. So everyone was trying to keep everything afloat. What's your response. There's no evidence that there was a $12.2 million principal. Well there was evidence your honor and go back to some of the trial exhibits if we look at trial exhibit five that had the unit sale and damages analysis that Mr Benitez testified to that listed all the gross sales and had an application. And that's where you have the 70,000 for each of the cable release units. Some of those units were released by Mr McBean without cable authority. We can also look at the trial exhibit six, which contained the closing statements and correspondence, showing what was to be paid through them so that showed the course of conduct to show that reimbursements were being made for the expenses the cable was supposed to pay. And I think the testimony trial was it's a net sum zero, we gave you credit. That was my question. My question to do with the principle of 2.2 million. Mr self said that can't find any evidence in the record as to that principle was 12.2 million which is what the judge awarded. Well we use that for also from the settlement agreement but trial exhibit seven also showed all of the units and expenses and payments and that's where it came from it. It really came from the testimony of Mr Benitez stating how he applied the money and in fact he said when he saw discrepancies. He reached out to him and everything from the beginning and came up with the numbers that were there. We have the money the money gets applied to interest and expenses first into principle last. And the fact is that this was a project that was losing money, because they couldn't get things done correctly. I was your honor stated under the settlement agreement, which included the loan documents not in the recitals, but in the actual terms said that the, the loan documents remain. And if there's a discrepancy, the terms of the settlement agreement. What we have here is we have the fact that Mr Mathene during his deposition, which was included as part of our motion for summary judgment, which support review said he disagreed with the numbers and needed to do an audit. He never did an audit, he never provided any evidence of what he thought the damages should be, because his testimony was the damages should be nothing because I didn't, I don't remember signing a personal guarantee. I mean, there is money doing knowing we provided the calculations we supported it with with the settlement agreement, and the other figures that we provided, and there's been no contradictory evidence to it other than I don't know the money or had the evidence in front of it, Mr. Mr Mathene had an obligation. He said he would be performing an audit but never did. And if he did, we've never seen. So to go back to some of the other issues that your honor raised again we do believe that this is a sale not a refinance and is, is the trial court said, not in its opinion but during the course of trial. He said the fact of the matter is when title transfers, it usually is an indication of a sale or a gift. Again, if this is a gift to an insider is Mr. Mr silks and not necessarily an insider but I think he called it a related party. Well, they're two separate entities is not a related entity, but it's controlled by an insider his wife. So, by sending these properties to his wife that does constitute a sale or transfer of title. So my client loses its secure position. Your Honor is correct though the parties did walk into this there was no fraud, the eyes were wide open everyone's trying to get to the same point in time to get this resolved. It's just the marketplace didn't allow for this. At the time we filed suit we did file suit on the note, and we did incorporate the damages as outlined by the settlement agreement. I believe there was a reduction in interest in fact so it definitely benefited Mr. It's your position that have damages were calculated under the note, they'd actually be more images and what I haven't done the numbers but I believe the interest was less so we could we could extrapolate and say yes damages would be less. I haven't done a calculation of in fact I have not calculated the damages that's counting is not my, my perfect. But as we've gone through we've given Mr theme credit for every dollar he's entitled. But the court made that determination. The court the court confirm that based on the testimony of Mr. Anita's, and the evidence we presented the two exhibits we've mentioned outright, and the closing statements. So again, we also see that, you know, the courts determination was based on several factors, as they stated, it was based on his review of the evidence in the testimony is hearing of the arguments of counsel and the attorneys, and of the witnesses Mr Benita's, Mr cable mission sir our plan effects are expert for the handwriting analysis and defendant. The judge also reviewed all of his trial notes and documents that were stipulated to an admitted into evidence. The argument is that we should not have been entitled to introduce that last exhibit I believe it was 17, which is the document that states buyer is a holding and lender is pen some logistics, but this document was in rebuttal to testimony that Mr McDean provided a trial. This is a document that was during discovery, and you didn't know you needed it until the evening before. But it's also supported by the fact that the document itself advises that counsel Rothchild Barry and Myers received money from this they received $435 from this. Basically escrow trust disbursement statement. So, this is a document they were well aware of or should have been aware of. I don't remember receiving it and discovery but we did produce it so the court was within its rights to within its authority to have this document. So after reviewing his trial notes, and after judging the credibility of the witnesses, including that of Mr McBean, the court determined what weight to give to each witness. As a result, and based on those arguments, the court found in favor of our client after listening to all the evidence and testimony, and also not hearing any contradictory evidence other than no it's just wrong. Your Honor's right this is not a very complex case we had all the documents we have all the materials, Mr McBean borrowed the money, he did not repay all the money, the parties did what they could to work this out over several years. I think the record pointed out that this is not the first lawsuit that was filed on this. And again, they come back to the table and work out a new resolution. So, these people did do their best to work this out, it just didn't happen at the end of the day. And as a result, my client is entitled to the judgment there. Thank you very much. Thank you very much. Mr. Thank you, Your Honor. A couple points, you know, first of all I didn't hear an answer to your question about the $12.2 million in principle. What I heard was counsel saying, well, our people just testified that money came in and they applied it to expenses. Again, the only testimony. The only evidence at trial was that fortune paid $13.3 million paid the loan down by 13.3 million. And the loan was $17 million, maybe it's 18 if you look at the settlement agreement. But there's just no way there was outstanding principle of $12.2 million. And in fact, Mr. Cato himself testified the outstanding principle was probably about $5 million or less. So, they have no, they put no evidence in their brief about where the $12.2 comes from. Mr. Giese just now did not provide any evidence or any argument as to where that money came from specifically. So, on that point, I believe the trial court was just incorrect. And when Mr. Giese said fortune has been given credit for every dollar paid. I don't see how that's possible when they paid $13.3 million. And a judgment was on a $17 million loan and a judgment was entered against him based on $12.2 million in principle. It's just trial. What amount of principle did your client put forth? Well, my client didn't put forth. I don't think that we put forth anything at trial because it's not our job to prove the plaintiff's damages. You didn't respond to damages. And all that's out there is for whatever the judge has to rely on. The judge has to make a decision on damages. And there was some evidence. And you just said that your side didn't respond to that. That's your choice. That's a strategic decision. Judge, there was nothing to respond to. There was. If you're asking for $12 million in principle and you're saying no, that we don't know that. Isn't there something to respond to? Well, judge, they never put forth any evidence on that. That was just what he said in his closing. So, you know, the only I mean, there's nothing respond to a trial or put forth evidence because the evidence at trial was that the principal amount was four or 5 million. That's the way I read. Well, I just read, as I read the, but the judge said he did not accept that amount from Mr. Cable. He didn't think Mr Cable had it right. I don't, I don't recall that being in the opinion, Your Honor. But, you know, all the documentation, all the documentation shows 13 million was paid by fortune. Again, you can, there is no evidence presented a trial as to this 12.2 million being owed in principle, it was just something council said in closing, and the judge simply wrote it down and entered it on that basis. And I have not seen anything. Sure. As far as the sale versus refinance argument. I didn't hear anything from Mr DC explaining how this is a sale, and again, we got caught up in a lot versus sale versus refinance. At the end of the day, the settlement agreement says what it says, all the units have to be sold before Cato pursues fortune. And so the, you know, the real question is probably the real question is not whether this is a refinance or a sale but and Cato as the plaintiff show that a sale of the 17 units occurred. And I think it's set forth in our briefs, there's about 1510 to 15 reasons, based on the testimony and documents as to why this was not a sale. And then on the other hand, there's the word buyer in one place on a piece of paper that refers to the same entity as a borrower, while their times. So, you know, that would be our position on the sale, and whether they'll occur or not. Thank you. Thank you very much. Thanks, both of you. They get under the argument about the technical difficulties, but we heard your full argument. And I appreciate your both of your being able to deal with that. And I apologize for the difficulties you're on and taking your time. Better that we hear from both of you, what you need to say, and we did. And just so you're reminded. And we'll proceed from there. So, thank you very much.